# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 21 2020, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Andrew R. Falk
Hendricks County Public Defender's Office
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of: K.A. (Minor Child)<br><br>and<br><br>K.A. (Mother),and C.A. (Father)<br><br>*Appellants-Respondents,*<br><br>*v.*<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | January 21, 2020<br><br>Court of Appeals Case No. 19A-JT-1520<br><br>Appeal from the Hendricks Superior Court<br><br>The Hon. Karen M. Love, Judge<br><br>Trial Court Cause No. 32D03-1811-JT-26 |

**Bradford, Chief Judge.**

# Case Summary

[1] K.A. ("Child") was born to K.A. ("Mother") and C.A. ("Father") (collectively, "Parents") on December 1, 2010. (Appellant's App. Vol. II p. 82). In May of 2013, Child was found to be a child in need of services ("CHINS") following Parents' admission that they had ongoing issues with substance abuse and drug-related criminal charges. This first CHINS case was closed in 2014.

[2] In July of 2016, the juvenile court found Child to be a CHINS a second time and later ordered Parents to complete several reunification services, including abstaining from the use of alcohol or illegal drugs. Over the course of the next two years, Parents continued to test positive for illegal drug use and missed many drug-screen appointments, which were to be considered positive screens. Parents failed on numerous occasions to follow plans for Child's safety and repeatedly violated the terms of visitation.

[3] In 2018, Parents participated in an inpatient drug-treatment program but were discharged from follow-up treatment. In November of 2018, DCS petitioned to terminate Parents' parental rights to Child ("the TPR Petition"), and both tested positive for illegal drugs within weeks. The juvenile court held an evidentiary hearing on the TPR Petition over three days in January of 2019, after which it terminated Parents' parental rights to Child. Parents claim that several of the juvenile court's findings of fact are unsupported by the evidence and that the juvenile court erred in concluding that the conditions that resulted in Child's removal from Parents' care were not likely to be remedied. Because we disagree, we affirm.

# Facts and Procedural History

[4]     On December 1, 2010, Child was born to Parents. In November of 2012, Father was convicted of Class B felony dealing in a schedule I, II, or III controlled substance and was eventually sentenced to 2190 days, with thirty-four days executed and 2156 suspended to probation. In June of 2013, Father was sentenced following a conviction for Class D felony possession of controlled substance to 910 days of incarceration, with 730 days suspended and 104 days served in work release, to be served consecutive to his November of 2012 dealing conviction. In June of 2013, Mother was convicted of Class D felony possession of a controlled substance and sentenced to 545 days of incarceration with 543 suspended.

[5]     Meanwhile, in May of 2013, DCS petitioned to have Child adjudicated a CHINS. On May 30, 2013, the juvenile court adjudicated Child a CHINS after Parents admitted that they had ongoing substance-abuse issues and that Father had a history of drug-related criminal offenses, including charges pending at the time. On June 20, 2013, the juvenile court ordered Parents into reunification services, including substance-abuse treatment. In March of 2014, the juvenile court closed the CHINS case because the conditions leading to the filing of the CHINS case had been resolved.

[6]     On June 22, 2016, DCS filed a second petition alleging that Child was a CHINS based on Parents' substance-abuse history, Mother's overdose on June 18, 2016, and Parents' daily use of heroin while Child was in the home. The same day, the juvenile court authorized Child's removal from Parents' Clayton

home. On July 14, 2016, the juvenile court adjudicated Child a CHINS following Parents' admissions that "[Parents have] untreated substance use addiction and will not receive services without DCS and Court intervention. [Parents'] substance use impairs [their] ability to care for the child." Ex. Vol. IV pp. 49, 51.

[7] On October 28, 2016, the juvenile court entered its dispositional and parental participation orders, ordering Parents into reunification services. The juvenile court ordered Parents to maintain contact with their DCS Family Case Manager ("FCM"); allow the FCM to see their home; enroll in FCM-recommended programs; keep appointments with the FCM, Child's guardian *ad litem* (GAL), and service providers; maintain suitable housing and a stable source of income; not use illegal drugs and alcohol; obey the law; complete a substance-abuse assessment and follow its recommendations; submit to random drug screens; visit Child; and complete a mental-health assessment and follow its recommendations. The juvenile court also ordered that any request for a drug screen not completed in a timely manner would be considered a positive screen.

[8] On November 9, 2016, the juvenile court found that while Parents were still using heroin, they had visited Child, cooperated with DCS, and enhanced their ability to fulfill their parental obligations. On February 8, 2017, the juvenile court found that Parents were compliant in services but also found that Mother had tested positive for heroin in October of 2016 and for heroin metabolite in December of 2016 and that Father "continues to test positive for morphine,

fentanyl and heroin metabolite." Ex. Vol. IV p. 65. On March 1, 2017, Father was sentenced to four days of incarceration following his conviction for Class C misdemeanor possession of paraphernalia.

[9] On March 22, 2017, the juvenile court ordered Father to report to an inpatient treatment facility immediately if he failed to comply with maintaining sobriety or comply with attending services in the following manner:

> 2. The parties agree that Father will maintain sobriety and participate in individual counseling, substance abuse counseling, and NA/AA meetings in lieu of in-patient treatment for the next 90 days.
>
> 3. Father will provide random drug screens within 24 hours of request and provide negative drug screens.
>
> 4. Father will attend either individual counseling, substance abuse counseling, or an NA/AA meeting every day, Father may have one day per week that he does not attend these services if he has a visit with the child that day.

Ex. Vol. IV p. 73.

[10] On May 17, 2017, the juvenile court found that Mother had tested positive for methamphetamine and that Father had tested positive for heroin, morphine, and methamphetamine. Father admitted to using heroin and morphine. Father declined DCS's offer to go to a twenty-one-day inpatient program at Tara Treatment Center.

[11] In June of 2017, Mother was approved for overnight and unsupervised visits with Child. On August 30, 2017, the juvenile court held a show cause hearing and found Father in contempt: "Father has failed to maintain sobriety, consistently participate in substance abuse treatment and follow the

recommendations of his substance abuse service provider in attending in-patient drug treatment." Ex. Vol. IV p. 88. The juvenile court sentenced Father to thirty days in work release starting October 17, 2017, but it allowed him to purge his contempt by completing a substance-abuse assessment within twenty-one days and following all recommended treatment, participating in all court-ordered services, and providing consistent negative drug screens.

[12] DCS FCM Steven Junkersfeld took over Child's case in October of 2017. On October 10, 2017, Mother's visits reverted back to supervised status due to Parents' failure to follow the safety plan. Father, who was not to have any unsupervised contact with Child, had been going to Mother's home during Child's visits with Mother. On November 8, 2017, the juvenile court found that Father had again tested positive for illegal drugs, including heroin, morphine, fentanyl, and buprenorphine on September 6 and 29, 2017, and THC on October 13. The juvenile court also found that Mother had violated the safety plan by allowing Father to drive with Child while he was under the influence and had allowed Father to stay overnight.

[13] On January 3, 2018, the juvenile court held a permanency hearing. The juvenile court cited to Mother's violation of the safety plan and that Father had not been to therapy sessions and had failed to communicate with FCM Junkersfeld. The juvenile court approved a concurrent permanency plan of reunification and termination of parental rights with adoption. By February of 2018, Mother had again progressed to unsupervised and overnight visits. Soon thereafter, however, FCM Junkersfeld learned that Father had had

unsupervised contact with Child during one of Mother's overnight visits. On February 23, 2018, Mother's visits again reverted back to supervised status due to the violation. In March of 2018, Mother and Father lost the apartment in which they had been residing and did not provide any further housing information to FCM Junkersfeld.

[14] On April 11, 2018, the juvenile court suspended Father's visits until he completed a substance-abuse evaluation and had four consecutive negative drug screens. On April 18, 2018, the juvenile court found that Parents had not complied with their case plan. Mother had failed to follow through with services and had missed six drug screens from December of 2017 through January of 2018. Mother had also violated another safety plan regarding visitation, so her visitations again reverted to supervised.

[15] Also in April of 2018, FCM Junkersfeld attempted to convince Father to go to Tara's residential treatment program because Father stated he "would like to get help" for his substance abuse. Tr. Vol. II p. 51. After FCM Junkersfeld arranged everything, however, Father said that he did not need help and would "figure it out on his own." Tr. Vol. II p. 51. Father told FCM Junkersfeld that he would "just find other ways" to achieve sobriety and "it's none of [FCM Junkersfeld's] business." Tr. Vol. II p. 52.

[16] FCM Melinda Brewer ("FCM Brewer") took over Child's case in May of 2018. Father's June 26, 2018, substance-abuse assessment recommended that he engage in inpatient treatment due to his daily use of heroin, methamphetamine, and marijuana. Father had four drug screens from March 29 through June 11,

2018, that were positive for amphetamine, heroin, THC, morphine, Tramadol, or combinations thereof. Father also missed twelve screens, which were considered positive. On July 30, 2018, Father was admitted to Tara Treatment Center for its twenty-one-day residential program. Tara discharged him with a recommendation to complete substance-abuse assessment at the Hamilton Center.

[17] On August 31, 2018, the juvenile court found that Mother had not completed her referred substance-abuse assessment and had tested positive for amphetamine, methamphetamine, acetylmorphine, and morphine on April 18, 2018. Mother also had ten presumptive positive screens because she failed to screen. Mother completed Tara's twenty-one-day residential inpatient program and was discharged with recommendations to complete inpatient treatment, individual therapy, and medication management.

[18] On November 16, 2018, the juvenile court found that Mother had been discharged from her substance-abuse treatment program at Cummins due to her failure to attend and that Father had not completed the recommended treatment at Hamilton Center. Father was also discharged from another intensive outpatient program on November 14, 2018, due to his failure to participate. The juvenile court also found that Parents "have minimally enhanced their ability to parent, but much work remains to be done to achieve and consistently maintain sobriety." Ex. Vol. IV p. 136.

[19] On November 28, 2018, DCS filed its TPR Petition. In December of 2018, Father was discharged from substance-abuse treatment at the Hamilton Center

due to non-compliance, and he failed to follow up with DCS's referral for another provider. Father had refused treatment and had missed twenty-seven drug screens. On December 11, 2018, Father was sentenced for Level 6 felony unlawful possession of a legend drug to 365 days, with 100 days to be served on work release and the balance on home detention. Mother tested positive for cocaine on November 29, 2018, and Father tested positive for cocaine on November 8 and 15, 2018. On January 2, 2019, the juvenile court again found that Parents had not complied with their case plan. FCM Brewer testified that Parents had relapsed around Thanksgiving and were not engaged in substance-abuse treatment and had not been consistently compliant with taking drug screens.

[20] The juvenile court held an evidentiary hearing on the TPR Petition on January 15, 17, and 24, 2019. According to Child's Maternal Grandfather, Parents had used drugs on and off since August of 2012. Other evidence admitted at the hearing indicated that, from June of 2016 to April of 2018, Father tested negative on eleven drug screens but tested positive on thirty-one screens for methamphetamine, amphetamine, THC, heroin, morphine, fentanyl, or combinations of these drugs. Mother's drug screens from June of 2016 to April of 2018 indicate that she tested negative on forty-six screens but tested positive for morphine, acetylmorphine, heroin, amphetamine, methamphetamine, or combinations of these drugs on seven occasions. Parents also had a history of missing drug screens despite being told that missed screens were to be

considered positive. In the later stages of this case, Mother missed eighteen screens from May to December of 2018, while Father missed twenty.

[21] FCM Junkersfeld testified that Parents' compliance with services had been sporadic and that he had referred Father to several substance-abuse assessments, home-based case management, mental-health counseling, drug screens, and residential treatment to address Father's substance abuse issues. FCM Junkersfeld had referred Mother for random drug screens, home-based case management, and substance-abuse assessments. As it happened, the only service Father completed during FCM Junkersfeld's tenure was mental-health counseling for his grief after a sibling's death. FCM Brewer testified that while Parents partially complied with services, they relapsed, after which they did not fully engage in services.

[22] The juvenile court also heard evidence regarding Child's situation since removal. Child has been placed with her Maternal Grandfather and his wife since her removal on June 18, 2016, and they provide Child with a safe and stable home for Child that is free from substance abuse. Child participated in family therapy because she "wanted to know more about why she was involved with DCS." Tr. Vol. II p. 172. Child knew that Parents had left over the summer for three weeks and that Father "needed to go to jail or something to that regard" and "she wanted clarity about those things." Tr. Vol. II p. 172. Father, however, encouraged Child to not participate, and eventually the therapy ceased. Maternal Grandfather agreed that the whole process has been stressful for Child.

[23]     FCM Junkersfeld testified that adoption was in Child's best interests based on the "overall timeline" for how long Child had been in care and Parents' response to services. Tr. Vol. II p. 58. FCM Brewer testified that the permanency plan never changed back to reunification because of Parents' substance abuse throughout the case. Parents had only been able to maintain sobriety for about three to six months when they were fully engaged in services, but they had not engaged sufficiently to obtain long-term sobriety. As a result, Parents were not able to provide care for Child. FCM Brewer opined that Parents had not remedied the conditions that led to Child's removal or the reasons for placement outside their home, that Parents' continued relationship between themselves and Child posed a threat to Child's well-being due to the ongoing substance abuse, and that termination was in Child's best interests because of Parents' ongoing substance abuse and lack of participation in services.

[24]     GAL Suzanne Conger was appointed in the 2013 CHINS case, the underlying CHINS case, and the termination case. GAL Conger testified that Child had been involved in two CHINS cases, that Parents had not achieved long-term sobriety, and that "I don't think children need to be a roller coaster with their parents. Children need stability. They need consistency. And, they need a drug free environment." Tr. Vol. III p. 137. GAL Conger noted that Child had had stability in her life only because she had been placed with Maternal Grandfather and opined that termination was in Child's best interests.

[25]    DCS's plan for the care and treatment of Child is adoption by Maternal Grandfather and his wife, who are willing to adopt. Maternal Grandfather testified that he did not intend to "cut [Child] off" from Parents. Tr. Vol. II p. 189. When asked if he intended to let Parents still see Child, Maternal Grandfather also testified, "See her most definitely. That's Mom and Dad. It always will be. Are they gonna take her out for ice cream for a while. No, sir." Tr. Vol. II p. 190.

[26]    On June 5, 2019, the juvenile court granted DCS's TPR Petition in an order that provides, in part, as follows:

> 1.     DCS has proved by clear and convincing evidence that there is reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied. Neither parent has demonstrated the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain sobriety and stability in order to care and provide adequately for the child.
>
> 2.     DCS has proved by clear and convincing evidence that continuation of the parent–child relationships poses a threat to the well-being of the child. The child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond to provide for the child's emotional and psychological as well as physical well-being. The child's well-being would be threatened by keeping the child in parent–child relationships with either parent whose own choices and actions have made them unable to meet the needs of this child.

3. DCS has proved by clear and convincing evidence that DCS has a satisfactory plan of adoption for the care and treatment of this child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has been found for this child with maternal grandfather and step grandmother.

4. DCS has proved by clear and convincing evidence that it is in the best interests of [Child] that the parental rights of [Parents] be terminated.

5. DCS has proved by clear and convincing evidence that the Child has been removed from the home and in custody of relative placement under DCS supervision for at least fifteen (15) of the most recent twenty-two (22) months.

Order pp. 36–37.

# Discussion and Decision

[27] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[28]     In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[29]     Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support the termination of parental rights, namely,

> (A) that [...] the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> [....]
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

> placement outside the home of the parents will not be remedied [or]
>
> (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.
>
> […]
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[1] Parents challenge several of the juvenile court's findings and also contend that insufficient evidence supports its conclusion that (1) there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside Parents' home will not be remedied and that (2) there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the Child.

# I. Challenged Findings of Fact

[30] Parents challenge several of the juvenile court's findings of fact. Our review is limited to whether the evidence supports the challenged findings, considering the evidence supporting the findings and reasonable inferences drawn therefrom. *See S.P.H.*, 806 N.E.2d at 879.

---

[1] Pursuant to Indiana Code section 31-35-2-4(b)(B)(iii), DCS could also satisfy subsection (B) with proof that "[t]he child has, on two (2) separate occasions, been adjudicated a child in need of services[.]" It does not appear that this basis was argued by DCS below, and, in any event, the juvenile court made no such finding.

[31] Finding of Fact 16 provides, in part, that "Mother admitted that she has an untreated substance abuse addiction and will not receive services without DCS and Court intervention. Mother further admitted that Mother's substance use impairs her ability to care for the child." Appellant's App. Vol. II p. 85. Although Parents contend that this finding misleadingly implies that Mother has consistently admitted these things, the finding itself clearly indicates that Mother's admissions were made on July 15, 2016.

[32] Finding of Fact 35 provides in relevant part that "FCM Junkersfeld tried regularly and repeatedly to remedy the parents['] lack of suitable housing[.] [Home-based care work] was an appropriate service to offer the parents due to their lack of suitable housing." Appellant's App. Vol. II p. 90. Finding of Fact 181 provides, in relevant part, that "Parents have delayed permanency for Child through their own actions, such as taking too long to find stable housing[.]" Appellant's App. Vol. II p. 111. Parents claim that the evidence does not support these findings. Parents, however, admitted to FCM Junkersfeld that they were "moving place to place[,]" and FCM Junkersfeld was unable to verify what their housing situation was. Parents have failed to establish that the juvenile court's finding in this regard was clearly erroneous.

[33] Parents also challenge the following findings of fact:

18. On August 11, 201[6] [A.A.], the parents' youngest child passed away as a result of injuries she received at the hands of her babysitter on or about August 8, 2016. [....]

36. [...] Both parents missed drug screens while FCM Junkersfeld was on the case. [....]

40. […] Court suspended Father's parenting time on April 12, 2018 until Father has four consecutive negative random drug screens. Father never satisfied this requirement while FCM Junkersfeld supervised the case. [….]

49. […] Mother violated the safety plan by allowing Father unsupervised contact with child. [….]

55. Parents were not cooperating and they were not maintaining sobriety. Parents were not completing services. [….]

80. Parents['] failure to achieve and maintain sobriety has placed child on a roller coaster emotionally. Child needs consistency and stability without DCS involvement. [….]

91. Parents have failed to cooperate With DCS and failed to stay in contact With both FCM[s], failed to provide random drug screens and failed to engage in services. [….]

111. […] Parents have been unable to effectively address their addiction to illegal substances in the over thirty (30) months the second CHINS Matter has been open. [….]

127. […] FCM Junkersfeld was never able to verify that Father actually worked, i.e., no pay stubs, etc. [….]

138. Parents had another child, [A.A.], who passed away on August 11, 2016 as a result of injuries inflicted upon her by a daycare provider. [….]

146. Although [A.A.]'s passing has been a tremendous burden for Parents, Child's ongoing stability and permanency should not remain unresolved indefinitely. [….]

158. […] After Father was discharged from Tara, Tara staff discovered a video of Father and two other men standing in a common area and one of the men reached up and turned the camera.

159. […] Before he left Tara, Father was struggling. [….]

179. […] Parents remain unable to maintain long term sobriety[.]

Appellant's App. Vol. II pp. 86, 90, 91, 93, 94, 97, 98, 101, 104, 105, 106, 108, 111. Parents do not argue that any of the preceding fourteen findings are unsupported by evidence. Parents claim , however, that some of the findings imply more than the evidence establishes, that the juvenile court failed to put some findings into the proper context, or that some are undercut by contrary evidence. These challenges are all variations on the same theme, *i.e.*, that the juvenile court failed to weigh the evidence properly. We do not accept Parents' invitation to reweigh the evidence.

## II.  Indiana Code Section 31-35-2-4(b)(2)(B)

[34]    Parents argue that DCS has failed to establish that there is a reasonable probability that the reasons for Child's continued removal would not be remedied or that there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of Child. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of these circumstances. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing, in part, that DCS must establish that one of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, or t]here is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child[.]").

[35]    We choose to address Parents' contention that DCS failed to establish that there is a reasonable probability that the conditions that led to Child's removal will not be remedied. In making such a determination, a juvenile court engages in a

two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted). The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[36]     Here, Child was removed because of Parents' long-standing issues with drug use. As for whether this situation is likely to be remedied, there is ample evidence to support a conclusion that it would not be. Parents began using drugs in August of 2012. In May of 2013, Child was first found to be a CHINS after Parents admitted that they had substance-abuse issues and that Father had a history of drug-related criminal offenses, including charges pending at the time. In June of 2016, Child was again removed from Parents' care due to their drug use and Mother's recent overdose. Child was again found to be a CHINS

following Parents' admissions that they had untreated substance-abuse issues and would not receive services without court intervention.

[37] From June of 2016 to April of 2018, Father tested positive on thirty-one drug screens for methamphetamine, amphetamine, THC, heroin, morphine, fentanyl, or combinations of these drugs while testing negative on eleven screens. Over the same period of time, Mother tested positive for morphine, acetylmorphine, heroin, amphetamine, methamphetamine, or combinations of these drugs on seven occasions while testing negative on forty-six drug screens. On June 11, 2018, Father tested positive for amphetamine, methamphetamine, THC, morphine, and fentanyl and positive for cocaine on December 8 and 15. Mother tested positive for amphetamine, methamphetamine, and morphine on June 11, 2018; amphetamine, methamphetamine, and fentanyl on July 12; fentanyl on July 17; and cocaine on November 29. Parents also missed drug screens, which the juvenile court made clear were to be considered positive results. Mother missed eighteen screens from May to December of 2018, while Father missed twenty. In summary, both Parents have a years-long history of substance abuse, and both had positive and missed drug screens within approximately six weeks of the first termination hearing.

[38] Parents have also not taken advantage of the treatment opportunities they have been given. On July 30, 2018, Father was admitted to Tara Treatment Center for its twenty-one-day residential program. Tara discharged Father with a recommendation to complete substance-abuse assessment at the Hamilton Center. At around the same time, Mother also completed Tara's twenty-one-

day residential inpatient program and was discharged with recommendations to complete inpatient treatment, individual therapy, and medication management. On November 16, 2018, however, the juvenile court found that Mother had been discharged from a substance-abuse treatment program at Cummins due to her failure to attend and that Father had not completed the recommended treatment at Hamilton Center. Father was also discharged from another intensive outpatient program on November 14, 2018, due to his failure to participate. As mentioned, both parents tested positive for illegal drugs after their failures to complete the recommended treatments explained above.

[39] By the time of the termination hearing, Parents had an over-six-year history of drug abuse, including drug-related criminal charges and convictions for each and despite Child's long-standing removal, with the last verified relapse occurring after inpatient-treatment and mere weeks before the termination hearing. The number of failed drug screens and no-shows indicate that neither Parent has been able to maintain sobriety for long, if at all, since Child's removal, and support an inference that neither was particularly interested in trying. The Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." *Egly v. Blackford Cty. Dep't. of Pub. Welfare*, 592 N.E.2d 1232, 1234–35 (Ind. 1992). The *Egly* Court also explained that "[a]1though parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." *Id*. at 1234. Given the evidence of Parents' unaddressed substance-abuse

problems (whether they are unable to address them or merely unwilling), the juvenile court did not err in finding that there was a reasonable probability that the conditions that had led to Child's removal would not be remedied.[2]

[40] The judgment of the juvenile court is affirmed.


Robb, J., and Altice, J., concur.

---

[2] Because of our disposition of this claim, we need not address Parents' claim that DCS failed to establish that there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of Child.